DECISION
{¶ 1} Relator, John B. Adkins, filed this original action requesting a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order, which denied him permanent total disability ("PTD") compensation, and to enter an order granting that compensation.
 {¶ 2} This court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny the requested writ. (Attached as Appendix A.) Relator has not objected to the magistrate's findings of fact, and we adopt them as our own.
 {¶ 3} As to the magistrate's conclusions of law, relator argues, first, that the magistrate erred in determining that the commission properly relied on the medical reports of Drs. Robert Turner and Donald L. Brown because neither doctor commented on the impact of relator's use of narcotic medication upon his return to sustained remunerative employment. Relator made this same argument to the magistrate, and we agree with the magistrate's careful consideration and resolution of the issue. As the magistrate concluded, the reports of Drs. Turner and Brown are some evidence upon which the commission could properly rely.
 {¶ 4} Second, relator argues that the staff hearing officer ("SHO") made improper findings concerning the non-medical evidence. Relator made this same argument to the magistrate, and we agree with the magistrate's consideration of the vocational evidence and the SHO's findings. We also agree with the magistrate's application of State ex rel. Jackson v. Indus.Comm. (1997), 79 Ohio St.3d 266, 271, to this case.
 {¶ 5} For these reasons, we overrule relator's objections to the magistrate's decision. Finding no error of law or other defect on the face of the magistrate's decision, this court adopts the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's decision, the requested writ is denied.
Objections overruled, writ of mandamus denied.
SADLER and McGRATH, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. John B. Adkins, :
Relator, :
v. : No. 05AP-1335
[William E. Mabe], Admr. Bureau of : (REGULAR CALENDAR) Workers' Compensation, Industrial Commission of Ohio and : CTL Engineering, Inc., :
Respondents. :
 MAGISTRATE'S DECISION Rendered on July 25, 2006 Calhoun, Kademenos, Heichel Childress Co., L.P.A., andChristopher S. Clark, for relator.
Jim Petro, Attorney General, and Eric J. Tarbox, for respondent Industrial Commission of Ohio.
Garvin Hickey, LLC, Preston J. Garvin, Michael J. Hickey
and Daniel M. Hall, for respondent CTL Engineering, Inc.
 IN MANDAMUS {¶ 6} In this original action, relator, John B. Adkins, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 7} 1. On July 13, 2000, relator sustained an industrial injury while employed as a laborer for respondent CTL Engineering, Inc., a state-fund employer. The industrial claim is allowed for "lumbar strain; thoracic strain and left hip strain; aggravation of pre-existing lumbar facet arthritis; major depressive disorder," and is assigned claim number 00-478917.
 {¶ 8} 2. Apparently, relator began receiving temporary total disability ("TTD") compensation that was paid by the Ohio Bureau of Workers' Compensation ("bureau").
 {¶ 9} 3. On January 9, 2004, at the bureau's request, relator was examined by psychologist James M. Medling, M.D., who wrote:
* * * Mr. Adkins has reached a state of MMI for his complaints of major depression. * * *
* * *
Mr. Adkins cannot return to his former position of employment due to the severity of his complaints of depression.
* * *
Mr. Adkins is judged to be not employable at the present time due to his psychological complaints. His level of drive and energy, over reliance of prescription medication, outbursts of anger, sarcasm, chronic depression, loss of confidence, self-esteem and self-worth along with concentration difficulties are viewed as creating significant barriers for any return to work goal.
 {¶ 10} 4. Based upon Dr. Medling's report, the bureau moved to terminate TTD compensation.
 {¶ 11} 5. Following a March 11, 2004 hearing, a district hearing officer ("DHO") issued an order terminating TTD compensation as of March 11, 2004, based upon a finding that the allowed psychological condition has reached maximum medical improvement ("MMI"). The DHO relied exclusively upon the January 9, 2004 report of Dr. Medling. Apparently, the DHO's order of March 11, 2004, was not administratively appealed.
 {¶ 12} 6. On February 17, 2004, relator filed an application for PTD compensation.
 {¶ 13} 7. On June 25, 2004, at the commission's request, relator was examined by Robert Turner, D.O., for the allowed physical conditions of the claim. Dr. Turner's report, dated June 30, 2004, contains a history which states in part:
Mr. Adkins is a 65 year old gentleman injured in 2000. He was employed I believe, as a roofing inspector, a position that for the most part was supervisory. On this particular day however, he was drilling cores from a roof to determine the source of leakage. The coring machine which apparently is quite a big machine, became stuck and threw him up against the wall. He did complain of low back pain but thought that it would recover. Unfortunately[,] it has not resolved but rather has gotten progressively worse. He has had x-rays of the lumbosacral and thoracic spine as well as the hip. He had demonstrated degenerative change in the lumbar spine. He had an MRI done of all three areas also which also have only shown degenerative changes. He has had facet joint blocks and facet joint rhizotomies done by radio frequency technique with absolutely no improvement in his symptoms. He does take narcotics and that does seem to improve his symptoms. His pain is present most of the time. It is improved with narcotic pain medication. It is improved some-what with rest. It is worsened with any sort of activity. He significantly limits any walking. He is unable to bend at all.
* * *
DISCUSSION:
The injured worker's physical examination really does not demonstrate significant abnormalities. His objective exam including x-rays and MRI's are normal for age. I have no doubt that he does have degenerative disease as does everyone his age, and I don't doubt that it hurts.
OPINION:
1. The injured worker has reached MMI with regard to each allowed conditions. The conditions for which I am evaluating him are lumbar strain, thoracic strain and left hip strain, aggravation of pre-existing lumbar facet arthritis.
2. His percentage of impairment according to the AMA Guides, 4th Edition, is 10%. I would describe this claimant for facet arthritis is a Type III DRE Category according to Table 72 on Page 110. His impairment for thoracic strain is 0, lumbar strain is 0, and for left hip strain is 0.
 {¶ 14} 8. Dr. Turner also completed a Physical Strength Rating form on which he indicated that relator can perform "light work."
 {¶ 15} 9. On June 25, 2004, at the commission's request, relator was examined by psychiatrist Donald L. Brown, M.D. Dr. Brown wrote:
In my opinion, Mr. Adkins has reached MMI with respect to his previously allowed major depressive disorder and it can be considered permanent. Utilizing the 4th Edition of the AMA Guides to the Determination of Permanent Impairment, I would rate him as having a Class II level of impairment. This is a mild level of impairment. Referencing the percentages from the 2nd
Edition in the 4th Edition, I would rate his impairment at 15-20%.
 {¶ 16} 10. On June 25, 2004, Dr. Brown completed an Occupational Activity Assessment form. The form poses two queries to the examining psychiatrist:
Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this injured worker meet the basic mental/behavioral demands required:
[1.] To return to any former position of employment?
[2.] To perform any sustained remunerative employment?
Dr. Brown responded "yes" to both queries.
 {¶ 17} 11. The commission requested an Employability Assessment Report from Carl Hartung, a vocational expert. The Hartung report, dated August 16, 2004, responds to the following query:
Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed condition(s), identify occupations which the claimant may reasonably be expected to perform, (A) immediately and/or, (B) following appropriate academic remediation or brief skill training.
 {¶ 18} Indicating acceptance of Dr. Turner's reports, Hartung listed the following employment options:
1.) Usher, Lobby Attendant, Ticket Taker, Service Station Attendant, Marking Clerk, Parking Lot Attendant, Production Inspector — Grader.
1b.) Counter Clerk, Guard — Watch Guard, Cashier.
 {¶ 19} Indicating acceptance of Dr. Brown's report, Hartung wrote: "No vocational limitations or restrictions."
 {¶ 20} Under "III.) Effects of Other Employability Factors," Hartung wrote:
1. Question: How, if at all, do the claimant's age, education, work history or other factors (physical, psychological and sociological) effect his/her ability to meet basic demands of entry level occupations?
Answer: Age: (65) Current age will significantly reduce [the] ability to adapt or adjust to new work tasks in different work setting[s] that are not directly related to prior work.
Education: (9th) A limited education reduces the ability to perform work that requires reading and writing detailed or complex instructions as a regular activity. The ability to perform entry-level work that uses demonstrat[ion] or oral instruction presentation is still retained.
Work History: Prior work has been in the skilled and semiskilled ranges. This demonstrated ability is more tha[n] adequate to meet the demands of entry level occupation requirements. There are no transferable skills for direct reentry to other skilled or semi-skilled occupations.
Other: none
2.) Question: Does your review of background data indicate whether the claimant may reasonably develop academic or other skills required to perform entry level Sedentary or Light job?
Answer: Age and length of time since last school participation (49 years) significantly reduce any probability that additional academic participation is likely. The ability to reasonably develop other skills required by entry level work is reduced by age.
3.) Question: Are there significant issues regarding potential employability limitations or strengths which you wish to call to the SHO's Attention?
Answer: Length of time since last workforce participation may be a barrier to re-entry into unskilled work activities.
Under "IV. Employability Assessment Database," Hartung wrote:
B. WORK HISTORY
Job Title * * * Skill Level Strength Level Dates Construction Inspector * * * Skilled Light 8/99-7/02 Carpenter/Contractor * * * Skilled Medium 1980-1999 Sales Rep. Motor Vehicles * * * Semi-Skilled Light 1975-1980 Laborer, General * * * Semi-Skilled Heavy 1958-1968 Overhead Crane Operator * * * Skilled Light
C. EDUCATIONAL HISTORY
 Highest Grade Completed: 9th
Date of Last Attendance 1955 H.S. Graduate No GED: No Vocational training: None ICO educational classification: Limited
 {¶ 21} 12. Following an April 26, 2004 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order states:
* * * This Order is based particularly upon the reports of the physician and psychologist identified in the body of this Order.
The injured worker is a 65 year old male whose date of birth is 8/18/1939. The injured worker last worked in July of 2000, which is shortly after this injury. The injured worker was working as a general laborer. He was operating a core drill drilling samples of concrete. The drill bound up and he tried to hold it and hurt his back and forced him against the wall. The injured worker was initially treated conservatively, but ultimately had surgery on 1/11/2001 and then on 2/12/2003. The injured worker's Temporary Total Disability Compensation was terminated on 3/11/2004 as a result of reaching Maximum Medical Improvement for the allowed psychological condition. The claim was allowed for the physical and psychological conditions identified above.
Again, the injured worker is 65 years old. There is the discrepancy in the evidence as to whether or not he completed high school. The testimony at hearing was that he had not completed high school, but he is capable of reading, writing, and performing basic math. The injured worker has worked in a variety of positions in the construction industry throughout the years. From August of 1999 to July of 2002, the injured worker worked as a roofing technician where he observed contractors and reported back to the owner. The injured worker indicates he used all manner of tools, drills, hammers, and concrete tools. The injured worker also worked as a custom remodeler attaching springs to oven doors assemblies in 2000. From 1998 to 1999, the injured worker worked as a welder for Newman Technology. He welded pipes to mufflers. From 1980 through 1999, the injured worker was self-employed doing painting, carpentry, and roofing. He used hammers, saws, and painting equipment. From 1975 to 1980, the injured worker sold cars.
The injured worker did participate in a Vocational Rehabilitation program, which included a job search program. The injured worker completed that program on 9/11/2001. The rehabilitation closure indicates that the injured worker has completed the program, therefore, there are no further services available to him.
The injured worker was evaluated on behalf of the Industrial Commission by orthopedist, Robert Turner, M.D., on 6/25/2004. Doctor Turner took a full and complete history of the injured worker, reviewed medical evidence on file, and performed a physical examination. As a result of the above, Doctor Turner finds that the injured worker's physical examination really does not demonstrate any significant abnormalities. His objective examination including x-rays and MRI(s) are normal for his age. Doctor Turner goes on to indicate that he does have degenerative disc disease, however, that is normal for anyone of his age, and it is separate from the facet arthritis. Doctor Turner goes on to opine that, with regard to the allowed physical conditions in the claim, the injured worker has reached Maximum Medical Improvement. The injured worker has a 10% whole person impairment related to the allowed physical conditions in the claim according to Doctor Turner's opinion. Doctor Turner then goes on to opine that the injured worker is capable of performing sustained remunerative work activity and working at the light level of activity.
The injured worker was also evaluated on behalf of the Industrial Commission by Donald Brown, M.D., a psychiatrist, on 6/25/2004. Doctor Brown took a full and complete history of the injured worker, reviewed psychological evidence on file, and performed a mental status evaluation. As the result of the above, Doctor Brown opines that, as to the psychological conditions, the injured worker has reached Maximum Medical Improvement. Doctor Brown indicates that the condition is now to be considered permanent. Doctor Brown finds that there is only a mild level of impairment related to the permanent depressive disorder. He would rate the impairment at a 15% to 20%. Doctor Brown goes on to opine that the psychological condition alone would not prevent the injured worker from returning to his former position of employment nor would it prevent the injured worker from performing any other type of sustained remunerative employment.
This Staff Hearing Officer finds that the injured worker is 65 years old. This is normally a retirement age, but that is not an indicative factor for determining permanent and total disability, as many individuals work well into their 70's. This Staff Hearing Officer finds that it appears that the injured worker was performing a lighter duty type activity at the time that he left the work-force in that he was going out to job sites observing contractors and then reporting back to the owner. This Staff Hearing Officer finds that, based upon the medical and psychological information on file, there doesn't appear to be any reason why the injured worker couldn't return to that type of work. Barring that, there is lighter duty type work that the injured worker would be able to perform still within the same industry, such as a roofing supervisor. The injured worker only has a 9th grade education, however, he is able to read, write, and perform basic math. He has been able to learn a skilled trade via operational manuals and on-the-job hands-on training. This does not indicate an individual who is not capable of learning other types of work or adapting to a new employment environment.
The injured worker does have some work experience that may not directly transfer into a lighter duty job, but would certainly have afforded him skills that could be use[d] in other employment capacities. In fact, the injured worker could perform a lighter duty of work in the field in which he was employed that being in a supervisory capacity. In addition, based upon the indication of a light duty work level and no impairment related to the psychological condition, the injured worker could immediately perform jobs such as an usher, lobby attendant, ticket taker, service station attendant, marking clerk, parking lot attendan[t], production inspector, or grader. With additional academic remediation and brief skill training, the injured worker could perform employment options such as a counter clerk, or a watch guard, or a cashier.
Therefore, this Staff Hearing Officer finds that, based upon the reports of Doctor Turner, Doctor Brown, and the injured worker's vocational factors, the injured worker is capable of performing sustained remunerative employment. Therefore, the injured worker's IC-2 Application, filed 2/17/2004, is hereby DENIED.
 {¶ 22} 13. On December 19, 2005, relator, John B. Adkins, filed this mandamus action.
Conclusions of Law:
 {¶ 23} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 24} Relator suggests that the reports of Drs. Turner and Brown must be removed from evidentiary consideration because allegedly "[b]oth reports failed to consider the effect of the use of narcotic medication." (Relator's brief at 10.)
 {¶ 25} Relator points to the numerous office notes from treating physician James R. Wolfe, M.D., that are contained in the record. According to relator:
* * * Dr. Wolfe's progress note of July 11, 2002, indicates that he provided Relator with a quantity of Vicodin, a narcotic medication, and continued to both prescribe and monitor its use until at least October 2004.
(Relator's brief at 10.)
 {¶ 26} Relator also points out that Dr. Medling found an "over reliance of prescription medication" as a factor preventing a return to work, and that Dr. Medling opined that relator cannot return to his former position of employment due to depression.
 {¶ 27} Relator's criticism of the reports of Drs. Turner and Brown goes to the weight that the administrative body might give to those reports rather than any issue as to whether those reports can be some evidence upon which the commission relies.
 {¶ 28} Moreover, Dr. Turner did address the narcotic question in his report. He noted that taking the narcotics seems to improve relator's symptoms. That Dr. Turner did not find the use of narcotics to be work-prohibitive, as relator suggests he should find, does not detract in any way from the report's evidentiary value as some evidence upon which the commission can rely.
 {¶ 29} Also, Dr. Brown noted in his four-page report: "His current medications are Vicodin, Celebrex, Xanax XR, 2 mgs at 8:00 PM, Prevacid, and Wellbutrin SR, 150 mgs per day."
 {¶ 30} The inference to be drawn is that Dr. Brown reviewed relator's medication use in rendering his evaluation. In his extensive interview, Dr. Brown elicited from relator his pain complaints and use of medication to control the pain: "He says he continues to have pain `just about all the time. Sometimes, I'll take pills and it will let up a little and I'll try to do something and its all back again.'"
 {¶ 31} That Drs. Turner and Brown did not draw the conclusions that relator feels they should have drawn from relator's use of prescribed medications does not destroy the evidentiary value of their reports. Thus, the reports of Drs. Turner and Brown are some evidence upon which the commission can and did rely.
 {¶ 32} Relator also asserts that the commission "did not consider the full content of the vocational reports presented." According to relator, the report of Samuel H. Osipow, Ph.D., "was ignored in its entirety." (Relator's brief at 11.)
 {¶ 33} The commission may credit offered vocational evidence, but expert opinion is not critical or even necessary, because the commission is the expert on the nonmedical issue. State ex rel.Jackson v. Indus. Comm. (1997), 79 Ohio St.3d 266, 271.
 {¶ 34} Here, the SHO rendered her own analysis of the nonmedical factors. However, at the end of her analysis, she does list the employment options listed by Hartung in his report as being applicable to Dr. Turner's report. Apparently, the SHO did rely on Hartung's listing of employment options.
 {¶ 35} It is apparent by comparing and contrasting the Hartung report with the SHO's order that the SHO did not entirely agree with Hartung's analysis of the nonmedical factors. The SHO greatly expanded Hartung's analysis, finding that relator's work history "does not indicate an individual who is not capable of learning other types of work or adapting to a new employment environment." It was clearly within the SHO's prerogative to expand upon Hartung's analysis and to disagree with some of Hartung's analysis. The magistrate cannot find an abuse of discretion in this regard. Jackson, supra.
 {¶ 36} The commission did not abuse its discretion by failing to mention or discuss the Osipow report. The commission does not have to list the evidence considered. State ex rel. Lovell v.Indus. Comm. (1996), 74 Ohio St.3d 250, 252. There is a presumption of regularity that attaches to commission proceedings. Id. The presumption here is that the SHO considered the Osipow report but found it unpersuasive. Id.
 {¶ 37} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.